Estado Libre Asociado de Puerto Rico
**TRIBUNAL DE APELACIONES**
**PANEL VIII**

| | | |
|---|---|---|
| Alejandro "Bimbo" Carmona Sánchez y Sherlil Orellana Gutiérrez por sí y en representación de su hijo menor de edad, Alejandro Carmona Orellana; y Héctor Joel Negrón Pagán y Lizmarie Gutiérrez de Jesús por sí y en representación de su hijo menor de edad, Joel Alejandro Negrón Gutiérrez<br><br>Apelados<br><br>vs.<br><br>Baloncesto Superior Nacional Corp.; Gigantes de Carolina; Osos de Manatí; y otros.<br><br>Apelante | KLAN202400135 | **APELACIÓN** procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Civil Núm.: SJ2023CV11017<br><br>Sobre:<br><br>Interdicto Preliminar y Permanente; Sentencia Declaratoria; Daños y Perjuicios |

Panel integrado por su presidente, el Juez Rivera Colón, el Juez Monge Gómez y el Juez Cruz Hiraldo.

Rivera Colón, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 29 de febrero de 2024.

Comparece ante nos, Baloncesto Superior Nacional Corp. (BSN o apelante), quien presenta recurso de apelación en el que solicita la revocación de la "Sentencia" emitida el 2 de febrero de 2024,[1] por el Tribunal de Primera Instancia, Sala Superior de San Juan. Mediante el referido dictamen, el foro primario declaró Ha Lugar la solicitud de *injunction* permanente presentada por Alejandro "Bimbo" Carmona Sánchez y Sherlil Orellana Gutiérrez por sí y en representación de su hijo menor de edad, Alejandro

---
[1] Notificada en igual fecha.

Número Identificador

SEN2024 _____

Carmona Orellana; y Héctor Joel Negrón Pagán y Lizmarie Gutiérrez de Jesús por sí y en representación de su hijo menor de edad, Joel Alejandro Negrón Gutiérrez (en conjunto, apelados), y le ordenó al BSN a cesar y desistir de aplicar retroactivamente la enmienda al Art. 20.1 del Reglamento General del BSN.

Examinada la solicitud de autos, la totalidad del expediente y el estado de derecho aplicable ante nuestra consideración, revocamos el dictamen mediante los fundamentos que expondremos a continuación.

**I.**

El 28 de noviembre de 2023, los apelados presentaron una "Demanda" contra el BSN solicitando, entre otros remedios, un interdicto preliminar y permanente. En esencia, alegaron que, el 13 de octubre de 2023, el BSN enmendó, de forma retroactiva, el Art. 20.1 de su reglamento, y eliminó la capacidad de las franquicias para reservar jugadores como "hijos de franquicia". Aducen que, tras esta enmienda, todos los jugadores elegibles al BSN tendrán que ser partícipes del sorteo de jugadores de nuevo ingreso. Arguyen que, la aplicación retroactiva de esta enmienda laceraría derechos adquiridos al amparo de la reglamentación vigente al momento en que estos ingresaron a las ligas menores, la cual establecía que los "hijos de franquicia" no tendrían que participar en el sorteo de jugadores de nuevo ingreso, una vez sean elegibles al BSN. De esta forma, podían ser reclamados por sus respectivos equipos (Gigantes de Carolina/Osos de Manatí), y firmar contrato sin la necesidad de ser partícipes en el sorteo. Por entender que la aplicación retroactiva de la enmienda les ocasionaría daños irreparables, solicitaron la expedición de un *injunction* preliminar y permanente.

Por su parte, el 11 de diciembre de 2023, el BSN presentó una "Oposición Jurada a Solicitud de Interdicto Preliminar y

Moción de Desestimación", y solicitó la desestimación de la reclamación bajo los siguientes argumentos, a saber: (1) conforme el Art. 3.7 del Reglamento General del BSN y el Art. 20 de la Ley Núm. 8-2004, *infra*, el tribunal no posee jurisdicción para atender la controversia; (2) por falta de parte indispensable, debido a que la regla enmendada no confiere derecho alguno a los jugadores sino a las franquicias, y éstas no fueron incluidas en el pleito; y (3) no concurren los elementos necesarios para conceder el remedio interdictal solicitado.

Al día siguiente, entiéndase, el 12 de diciembre de 2023, los apelados presentaron una "Moción en Cumplimiento de Orden y Oposición a Desestimación". En lo relativo al planteamiento sobre ausencia de jurisdicción, afirmaron que el Art. 3.7 del Reglamento General del BSN es inaplicable al caso, toda vez que éste no incluye a los "hijos de franquicia" ni a los jugadores de categorías menores. A su vez, indicaron que el término de "jugador", según definido en el reglamento, no incluye a los apelados. Lo anterior, debido a que éstos no han firmado contrato con equipo alguno y, según el reglamento, un "jugador" es "cualquier persona que advenga a firmar contrato con una de las franquicias del BSN para participar en calidad de jugador en los Torneos del BSN". Bajo esa misma premisa (que no han firmado contrato), expresaron que tampoco han aceptado la cláusula de selección de foro. Adicionalmente, negaron la falta de parte indispensable, y esgrimieron la procedencia del *injunction* solicitado.

Posteriormente, el 21 de diciembre de 2023, el BSN presentó "Réplica a la Oposición a la Moción de Desestimación Presentada por los Demandantes" y, en síntesis, enfatizó que, de una lectura a las alegaciones contenidas en la "Demanda", surge que los apelados se han identificado como "jugadores" de franquicias del BSN, las cuales participan en torneos BSN-D (novicios y juvenil).

Expuso que, por ser el BSN-D y las categorías menores criaturas reglamentarias del BSN, su funcionamiento está sujeto a las disposiciones reglamentarias del BSN, incluyendo la cláusula de selección de foro dispuesta en la Regla 3.7 del Reglamento General del BSN. Ante ello, reiteró que, el caso debe presentarse, en primera instancia, ante los foros deportivos correspondientes.

El 29 de diciembre de 2023, los apelados presentaron "Breve Dúplica a Réplica a Nuestra Oposición a Desestimación", y reiteraron que: (1) la única razón por la cual se les denominó como "jugadores" en la reclamación es porque ellos juegan baloncesto en categorías juveniles. No obstante, tal designación no les convierte en "jugadores" del BSN porque los apelados no han firmado contrato con algún equipo y, conforme el Reglamento de Procedimientos Adjudicativos del BSN, un "jugador" es aquél que ha firmado un contrato con alguna de las franquicias del BSN; y (2) como ninguno de los apelados ha firmado contrato, no se puede concluir que se sometieron y aceptaron la cláusula de selección de foro dispuesta en la Regla 3.7 del Reglamento General del BSN.

Por último, el 2 de enero de 2024, el BSN presentó "Moción Reiterando Solicitud de Desestimación en Atención a la Cláusula de Selección de Foro Contenida en el Reglamento del BSN", e insistió en que el foro *a quo* carecía de jurisdicción para atender la controversia debido a la cláusula de selección de foro recogida en la Regla 3.7 del Reglamento General del BSN.

Evaluados los escritos presentados por ambas partes, el 18 de enero de 2024,[2] el Tribunal de Primera Instancia emitió "Resolución y Orden" mediante la cual declaró No Ha Lugar la solicitud de desestimación presentada por el BSN. Aunque determinó que, los apelados pueden considerarse como "jugadores" para propósitos de la definición provista en el Reglamento de

---

[2] Notificada ese mismo día.

Procedimientos Adjudicativos del BSN, sostuvo que éstos sólo han participado en las ligas menores y no en la "Liga Superior Nacional". En ese contexto, razonó que la controversia estaba fuera de los límites del alcance textual de la Regla 3.7 del Reglamento General del BSN. Por otro lado, determinó que, el remedio a concederse no afectaría a las demás franquicias del BSN, por lo que éstas no debían considerarse partes indispensables en el pleito. Finalmente, determinó que, como los apelados presentaron una reclamación plausible, procedía la celebración de una vista de *injunction* preliminar.

Luego de que el BSN presentara su contestación a la "Demanda",[3] el 30 de enero de 2024, se celebró la vista de *injunction* preliminar a la cual comparecieron ambas partes. Considerada la prueba desfilada, el 2 de febrero de 2024,[4] el foro primario declaró Ha Lugar la petición de interdicto permanente presentada por los apelados. Concluyó que, la aplicación retroactiva de la enmienda al Art. 20.1 del Reglamento General del BSN les causaría un daño irreparable a los apelados, toda vez que frustraría sus esperanzas de ingresar a la liga superior del BSN. Asimismo, reiteró que, como los apelados no son jugadores en la "Liga Superior Nacional", no les aplica la cláusula de selección de foro contenida en la Regla 3.7 del Reglamento General del BSN. En términos análogos, resolvió que tampoco le puede ser oponible a los apelados la disposición que permite a la Junta de Directores del BSN modificar unilateralmente y "de tiempo en tiempo" la relación contractual entre las partes, la cual surge de la misma Regla 3.7 del Reglamento General del BSN. En fin, por entender que la concesión del remedio interdictal es necesaria para hacer valer la obligación entre las partes, ordenó al BSN a cesar y desistir

---

[3] Presentada el 23 de enero de 2024; véase, apéndice pág. 347.
[4] Notificada en igual fecha.

de aplicar retroactivamente la enmienda al Art. 20.1 del Reglamento General del BSN.

Inconforme con el dictamen, el BSN recurre ante esta segunda instancia judicial y señala la comisión de los siguientes errores, a saber:

1. *Erró el TPI al conceder un interdicto en un litigio en el cual no tenía jurisdicción conforme dispuesto en la Ley, la constitución de la FBPR y en la cláusula de selección de foro contenida la Regla 3.7 del Reglamento General del BSN.*

2. *Erró el TPI al reconocer acción legitimada a los demandantes para presentar una reclamación bajo una disposición reglamentaria que no le confiere derecho alguno a los jugadores sino a las franquicias y por tanto no había jurisdicción.*

3. *Erró el TPI al negarse a reconocer que las franquicias del BSN son partes indispensables sin las cuales no podía tramitarse el litigio debido a que invalidar [sic] la Regla 20.1 les priva de sus derechos a reclamar jugadores en el sorteo de nuevo ingreso.*

4. *Erró el TPI al intervenir indebidamente con la determinación del BSN de enmendar su Reglamento de manera cónsona con sus fines y propósitos sustituyendo su criterio por el criterio del organismo rector del BSN sin que mediase error, fraude, colusión o arbitrariedad.*

5. *Erró el TPI al aplicar el Artículo 1249 del Código Civil de 2020 como fundamento para anular la Regla 3.7 del Reglamento General que autoriza al BSN a enmendar su Reglamento de tiempo en tiempo.*

6. *Erró el TPI al determinar que los demandantes se exponen a sufrir daños irreparables por no existir un remedio en Ley a sus reclamos, y que se cumplen con los requisitos del balance de equidades y el interés público.*

**II.**

**-A-**

La jurisdicción es el poder o autoridad de un tribunal para considerar y decidir casos y controversias. *Allied Mgmt. Group v. Oriental Bank*, 204 DPR 374, 385 (2020). Tanto los foros de instancia como los foros apelativos tienen el deber de, primeramente, analizar en todo caso si poseen jurisdicción para atender las controversias presentadas. *JMG Investment v. ELA et*

*al.*, 203 DPR 708, 714 (2019). Esto es así, pues, los tribunales debemos ser celosos guardianes de nuestra jurisdicción, y no tenemos discreción para asumir jurisdicción donde no la hay. *Pueblo v. Ríos Nieves*, 209 DPR 264, 273 (2022). Por consiguiente, las cuestiones jurisdiccionales son materia privilegiada y deben resolverse con preferencia a los demás asuntos. *Mun. de San Sebastián v. QMC Telecom*, 190 DPR 652, 660 (2014). Cuando no tenemos jurisdicción sobre un recurso, debemos así declararlo y desestimar la causa de acción sin entrar en los méritos de la controversia. *Íd.* En otras palabras, los foros judiciales de Puerto Rico tienen autoridad para atender cualquier causa de acción, salvo que no tengan jurisdicción sobre la materia. *Rodríguez Rivera v. De León Otaño*, 191 DPR 700, 708 (2014).

La jurisdicción sobre la materia "se refiere a la capacidad del tribunal para atender y resolver una controversia sobre un aspecto legal". J.A. Echevarría Vargas, <u>Procedimiento Civil Puertorriqueño</u>, [s.l.], [ed. del autor], 2010, pág. 25. "[P]ara privar a un 'tribunal de jurisdicción general' de su actividad para entender en algún asunto en particular, es necesario que así se haya dispuesto expresamente en algún estatuto o que ello surja del mismo por implicación necesaria". D. Fernández Quiñones, <u>Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme</u> 582 (3ra ed. 2013). La ausencia de jurisdicción sobre la materia da lugar a las consecuencias siguientes:

> *(1) no es susceptible de ser subsanada; (2) las partes no pueden voluntariamente conferírsela a un tribunal como tampoco puede éste arrogársela; (3) conlleva la nulidad de los dictámenes emitidos; (4) impone a los tribunales el ineludible deber de auscultar su propia jurisdicción; (5) impone a los tribunales apelativos el deber de examinar la jurisdicción del foro de donde procede el recurso, y (6) puede presentarse en cualquier etapa del procedimiento, a instancia de las partes o por el tribunal motu proprio. Beltrán Cintrón et al. v. ELA et al.*, 204 DPR 89, 101-102 (2020).

Por ende, como foro apelativo intermedio nos corresponde evaluar la decisión recurrida, así como la etapa del procedimiento en que es presentada, con el propósito de determinar si es la más apropiada para intervenir. *Torres Martínez v. Torres Ghigliotty*, 175 DPR 83, 97 (2008).

**-B-**

Nuestro ordenamiento jurídico reconoce varias normas de autolimitación judicial, entre éstas, la doctrina de jurisdicción primaria. *MCS Advantage v. Fossas Blanco et al.*, 211 DPR 135, 146 (2023). Se trata de una norma de origen jurisprudencial, cuyo propósito es precisar el foro que atendería la controversia en primera instancia. *Beltrán Cintrón et al. v. ELA et al.*, *supra*, a la pág. 102. En palabras sencillas, se refiere a la tarea de examinar si es el tribunal o una agencia quien debe entender, de forma inicial, el caso que se está presentado. Lo anterior, pues, existen instancias en las cuales un tribunal debe abstenerse de ejercer su jurisdicción hasta tanto la agencia administrativa resuelva la controversia. *MCS Advantage v. Fossas Blanco, supra,* a la pág. 146. Por lo que, ante un planteamiento de jurisdicción primaria, debemos hacernos la siguiente interrogante: ¿A qué foro -el administrativo o el judicial- le corresponde adjudicar inicialmente la controversia? *Íd.* Al contestar dicha interrogante, el tribunal deberá "examinar los alcances de la ley habilitadora de una agencia y determinar si el asunto cae estrictamente dentro de su ámbito. Además, le exige que ponderen y determinen si es imprescindible y necesario que se resuelva en favor de que intervenga inicialmente la agencia". *Consejo Titulares v. Gómez Estremera et al.*, 184 DPR 407, 430 (2012).

La doctrina de jurisdicción primaria tiene dos vertientes, a saber: (1) la concurrente, y (2) la exclusiva. *CBS Outdoor v. Billboard One, Inc. et al.*, 179 DPR 391, 404 (2010). La primera

vertiente, entiéndase la jurisdicción primaria concurrente, presupone que tanto el foro judicial como el administrativo ostentan jurisdicción para resolver la controversia planteada. Empero, a pesar de que ambos foros poseen jurisdicción legal, en la mayoría de las ocasiones, debido a la pericia y el conocimiento especializado que posee el organismo administrativo, "ocurre un aplazamiento de interacción del Tribunal hasta que se proceda a resolver finalmente por la agencia". *Rodríguez Rivera v. De León Otaño, supra,* a la pág. 710, citando a D. Fernández Quiñones, Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme, pág. 563 (3ra ed. 2013). Ahora bien, la doctrina de jurisdicción primaria concurrente no aplica automáticamente. *CBS Outdoor v. Billboard One, Inc. et al., supra,* a la pág. 406. Sobre este particular, nuestro Máximo Foro ha expresado lo siguiente:

> *No existe una fórmula precisa para determinar cuándo aplicar o no alguna excepción de la doctrina de jurisdicción primaria concurrente. Por ello, los tribunales deben hacer una evaluación pragmática y 'sopesar todos los factores y circunstancias que apuntan o no a la conveniencia de permitir que la reclamación se dilucide inicialmente en el foro administrativo'. Entre los factores que han de ponderarse para aplicar o no la doctrina de jurisdicción primaria se encuentran los siguientes: (a) el peritaje de la agencia sobre la controversia; (b) la complejidad técnica o especializada de la controversia; (c) la conveniencia o necesidad de una adjudicación rápida; (d) la conveniencia de utilizar técnicas más flexibles de adjudicación; (e) lo adecuado del remedio administrativo. En fin, la aplicación o no de esta segunda vertiente 'impone que se pondere y determine si es imprescindible y necesario que se resuelva [a] favor de que intervenga inicialmente la agencia'. Íd., a la pág. 407.*

Por ende, dicha norma no es de aplicación cuando la cuestión a resolverse es de estricto derecho o puramente judicial. *Íd.,* a la pág. 406.

En cambio, la segunda vertiente, entiéndase la jurisdicción primaria exclusiva o estatutaria, está presente cuando la ley le confiere jurisdicción inicial exclusiva a la agencia administrativa

para entender en la reclamación. *Beltrán Cintrón et al. v. ELA et al., supra,* a la pág. 102. Nuestro Tribunal Supremo ha resuelto que, aunque la designación de la jurisdicción exclusiva debe hacerse de forma clara y precisa, no es necesario que surja expresamente del estatuto, sino que, corresponde evaluar si surge por implicación necesaria. *Rodríguez Rivera v. De León Otaño, supra,* a la pág. 709, citando a D. Fernández Quiñones, *op. cit.,* a la pág. 582. Claro está, si se determina que, en efecto, se realizó una designación de jurisdicción exclusiva a la agencia, le corresponde a esta última atender, como cuestión de prioridad, el caso. Ante tal mandato legislativo, la jurisdicción primaria concurrente no es de aplicación, y el tribunal está impedido de resolver, en primera instancia, la controversia. Sin embargo, ello "no soslaya la revisión judicial posterior de la decisión del organismo". *SLG Semidey Vázquez v. ASIFAL,* 177 DPR 657, 677 (2009). A fin de cuentas, es el tribunal quien posee la facultad de resolver la cuestión jurisdiccional. *Íd.*

**-C-**

La Ley Núm. 8-2004, 3 LPRA sec. 444 *et seq.,* conocida como la Ley Orgánica del Departamento de Recreación y Deportes, según enmendada, se aprobó con el propósito de regular y fiscalizar toda actividad de recreación y deportes, incluyendo sus organizaciones. Véase, Art. 2 (f) de la Ley Núm. 8-2004, 3 LPRA sec. 444. En lo que nos concierne, este estatuto reconoce la creación de organizaciones que tengan el fin de desarrollar el deporte, tales como el Comité Olímpico de Puerto Rico (COPUR) y sus federaciones deportivas afiliadas. Véase, Art. 2 (m) de la Ley Núm. 8-2004, *supra.* Asimismo, estableció la clara política pública de que tales organizaciones funcionarán "con tal autonomía de la gestión gubernamental y rigiéndose por sus propios reglamentos y

determinaciones, de acuerdo con la política del Olimpismo Internacional". *Íd.*

En ese contexto, el Art. 20 de la Ley Núm. 8-2004, 3 LPRA sec. 444p, dispone que, el COPUR y las federaciones deportivas nacionales poseen autonomía "para dirigir el deporte olímpico y para regirse por sus propios reglamentos y determinaciones exentos de la intervención del Estado en los asuntos de jurisdicción olímpica y federativa". Esto, en cumplimiento con el Capítulo 4 de la Carta Olímpica del Comité Olímpico Internacional (Carta Olímpica), el cual dispone que los Comités Olímpicos Nacionales, uno de los cuales es el COPUR, deben preservar su autonomía libre de presiones que le impidan ajustarse a la Carta Olímpica.

Por esta razón, el Art. 20 de la Ley Núm. 8-2004, *supra*, clarifica que el Departamento de Recreación y Deportes (DRD) "no interferirá con el cumplimiento de la Carta Olímpica por el [COPUR]", y que nada de lo establecido en la ley se aplicará al "deporte Olímpico", las actividades del COPUR y sus federaciones afiliadas reiterando así "la autonomía de las organizaciones olímpicas puertorriqueñas para dirigir el deporte olímpico sin la intervención, control o supervisión del Gobierno de Puerto Rico o de los gobiernos municipales". *Íd.*

Como parte de las federaciones afiliadas al COPUR se encuentra la Federación de Baloncesto de Puerto Rico (FBPR), organismo rector del baloncesto en nuestro País. Según la propia Constitución de la FBPR, esta organización "es la única autoridad competente para organizar y regular el baloncesto en Puerto Rico" y, como tal, posee la función, autoridad y obligación de "[c]ontrolar, reglamentar, supervisar y dirigir el deporte del baloncesto en Puerto Rico, tanto masculino como femenino, en todas las formas y para todas las edades". Véase, Art. 1 sec. 1.2 y Art. 5 sec. 5.1 de la

Constitución de la FBPR. En ese contexto, las "instituciones afiliadas y avaladas a la Federación están obligadas a cumplir con [su] Constitución, los Reglamentos Internos y otras reglas, determinaciones y decisiones de la FBPR". Véase, Art. 1 Sec. 1.4 de la Constitución de la FBPR.

El Baloncesto Superior Nacional de Puerto Rico (BSN) es una entidad afiliada a la FBPR, según lo reconoce el Art. 1.1 de su Reglamento General,[5] el cual lee como sigue:

> *[E]sta entidad está afiliada a la Federación de Baloncesto de Puerto Rico. Cuenta con personalidad jurídica propia y goza de autonomía para su organización interna y funcionamiento. Tiene como propósito organizar, promover y desarrollar una liga de alto rendimiento que cumpla con el propósito de estar a la par con el desarrollo mundial del deporte de baloncesto.*

Como entidad afiliada, el BSN es miembro de la FBPR. Véase, Art. 11 de la Constitución de la FBPR. Los miembros de la FBPR deben cumplir una serie de obligaciones, entre estas, las siguientes:

> *a. Cumplir en todo momento con las reglas de FIBA, del COPUR, las establecidas en esta Constitución, Reglamentos, normas y decisiones de la FBPR.*
>
> *[…]*
>
> *d. Participar en el territorio nacional de Puerto Rico en ligas, clubes, con jugadores y oficiales en competencias oficialmente reconocidas por la FBPR y en competencias internacionales reconocidas por FIBA, según corresponda, y conforme a las normas aplicables.*
>
> *[…]*
>
> *f. Cumplir con todas las reglamentaciones establecidas en la presente Constitución.*

A su vez, el Art. 13.2 de la Constitución de la FBPR provee que sus miembros:

> *[D]eberán canalizar cualquier protesta u objeción conforme establecido en la Constitución y Reglamentos de FBPR, mantenerlos dentro de los canales deportivos establecidos en esta federación, el COPUR, la FIBA, el Comité Olímpico Internacional (COI) y los Tribunales Deportivos reconocidos por éstos. La membresía en esta federación significa que el miembro renuncia a*

---

[5] Según enmendado, hasta el 13 de octubre de 2023.

*presentar un caso ante cualquier organismo que no sean los antes enumerados incluyendo que renuncia a presentarlos ante los tribunales de justicia reconociendo que las determinaciones del órgano deportivo de más alta jerarquía con jurisdicción en cada caso serán final, firme y definitiva.*

Debido a que el BSN está afiliado a la FBPR, dicha entidad deberá "asegurarse que sus reglas, reglamentos y decisiones cumplan en su totalidad con [la] Constitución y los reglamentos de la FBPR". Véase, Art. 13.4 de la Constitución de la FBPR. En cumplimiento con dicha obligación, el BSN adoptó el Art. 3.7 del Reglamento General del BSN, el cual reconoce su autoridad reglamentaria y la renuncia sobre los foros no deportivos. En términos literales, el antedicho artículo establece que:

*Todo aquel que asuma el cargo de apoderado o coapoderado, Gerente General, personal administrativo del BSN, Árbitros, Oficiales de Mesa, Dirigentes, Jugadores, de cualquier equipo de la LIGA SUPERIOR NACIONAL DE BALONCESTO DE PUERTO RICO, reconocen que se someten a las disposiciones reglamentarias de cualquier tipo que rijan el organismo y sus torneos, que estén vigentes o que sean aprobadas de tiempo en tiempo por la Junta de Directores de la Liga y que darán fiel cumplimiento a las mismas.*

*En consecuencia, reconocen que asumir dichos cargos constituirá una renuncia expresa a recurrir a foros no deportivos para dilucidar cualquier controversia que surja por la aplicación de tales disposiciones reglamentarias sin agotar remedios administrativos previamente. Violentar las disposiciones de este artículo será razón suficiente para la expulsión de la persona que así incumpla de toda función en la Liga.*

Finalmente, el Reglamento de Procedimientos Adjudicativos del BSN,[6] el cual aplica a todo procedimiento o querella ante el BSN,[7] define el término de "jugador" como "cualquier persona que advenga a firmar contrato con una de las franquicias del BSN para participar en calidad de jugador en los Torneos del BSN".[8] Por su parte, el Art. 15.1 de la Constitución de la FBPR dispone que "se considerarán jugadores y jugadoras de baloncesto las personas naturales que practiquen esta especialidad deportiva".

---

[6] Aprobado el 15 de marzo de 2023.
[7] Véase, parte III del Reglamento de Procedimientos Adjudicativos del BSN.
[8] Véase, parte IV del Reglamento de Procedimientos Adjudicativos del BSN.

Finalmente, debemos resaltar que el Art. 13.4 de la Constitución de la FBPR hace la siguiente aclaración:

> *Esta Constitución y los reglamentos de la FBPR deberán ser reconocidos como que forman parte de las reglas y reglamentos de las organizaciones afiliadas a esta Federación. En caso de duda y conflicto entre dichas disposiciones y las disposiciones de esta Constitución y los Reglamentos de la Federación, estos prevalecerán.*

### III.

Conforme el trámite procesal ya discutido, los apelados presentaron una "Demanda" ante el foro recurrido, solicitando se le ordenase al BSN a cesar y desistir de aplicar retroactivamente la enmienda al Art. 20.1 del Reglamento General del BSN. La parte apelante argumentó que, el foro de instancia carecía de jurisdicción para atender el pleito, toda vez que la disputa, por estar cobijada por autonomía deportiva, está reservada a los foros deportivos. Empero, el Tribunal de Primera Instancia concluyó que poseía jurisdicción para atender la controversia. Para llegar a esta conclusión, el foro primario analizó el lenguaje de la Regla 3.7 del Reglamento General del BSN, y determinó que la cláusula de selección de foro no les aplica a los apelados, toda vez que la regla hace referencia a jugadores de cualquier equipo de la "Liga Superior Nacional". Por entender que los apelados solo han participado en las ligas menores y no en la "Liga Superior Nacional", se negó a desestimar el caso bajo este fundamento.

En su escrito, el BSN señala que el foro *a quo* erró al conceder el *injunction,* aun cuando este carecía de jurisdicción para ello. Como es sabido, las cuestiones relativas a la jurisdicción del tribunal deben resolverse con preferencia a cualesquiera otras. *Báez Figueroa v. Adm. Corrección,* 209 DPR 288, 298 (2022). Por consiguiente, atendemos este aspecto primeramente.

Según el derecho discutido en el acápite anterior, los Comités Olímpicos Nacionales, uno de los cuales es el COPUR,

preservarán su autonomía sin la intervención, control o supervisión del gobierno, y libre de presiones jurídicas. En sintonía con ello, la Ley Núm. 8-2004, *supra*, expresamente reconoce que el COPUR y sus federaciones deportivas afiliadas, como lo es la FBPR, funcionarán con autonomía propia, rigiéndose por sus propios reglamentos y determinaciones, conforme la política del Olimpismo Internacional. En resumen, tanto el COPUR como la FBPR poseen autonomía "para dirigir el deporte olímpico y para regirse por sus propios reglamentos y determinaciones exentos de la intervención del Estado en los asuntos de jurisdicción olímpica y federativa". Véase, Art. 20 de la Ley Núm. 8-2004, *supra.*

Como entidad autorizada por el COPUR para organizar y regular el baloncesto en Puerto Rico, la FBPR posee su propia Constitución y demás reglas, las cuales deberán cumplirse por aquellas instituciones afiliadas a la FBPR como, por ejemplo, el BSN. Esto implica que, como entidad afiliada, el BSN es miembro de la FBPR y, como tal, está sujeto al cumplimiento de ciertas obligaciones, entre ellas, cumplir con las reglas del COPUR, y con la Constitución, reglamentos, normas y decisiones de la FBPR.

Por ende, el BSN está sujeto al cumplimiento del Art. 13.2 de la Constitución de la FBPR, el cual dispone lo siguiente:

> *Los miembros de la Federación deberán canalizar cualquier protesta u objeción conforme establecido en la Constitución y Reglamentos de FBPR, mantenerlos dentro de los canales deportivos establecidos en esta federación, el COPUR, la FIBA, el Comité Olímpico Internacional (COI) y los Tribunales Deportivos reconocidos por éstos. La membresía en esta federación significa que el miembro renuncia a presentar un caso ante cualquier organismo que no sean los antes enumerados incluyendo que renuncia a presentarlos ante los tribunales de justicia reconociendo que las determinaciones del órgano deportivo de más alta jerarquía con jurisdicción en cada caso serán final, firme y definitiva.*

(Énfasis nuestro).

Como ya explicamos, el BSN está afiliado a la FBPR y, como su miembro, no tan solo está sujeto al cumplimiento de la precitada disposición, sino que, además, deberá asegurarse que sus propias reglas y reglamentos sean cónsonas con aquellas de la FBPR.

El BSN posee un Reglamento General, el cual reconoce su autoridad reglamentaria y la renuncia sobre los foros no deportivos. Específicamente, la Regla 3.7 del antedicho reglamento provee que:

> *Todo aquel que asuma el cargo de apoderado o coapoderado, Gerente General, personal administrativo del BSN, Árbitros, Oficiales de Mesa, Dirigentes, **Jugadores**, de cualquier equipo de la **LIGA SUPERIOR NACIONAL** DE BALONCESTO DE PUERTO RICO, **reconocen que se someten a las disposiciones reglamentarias de cualquier tipo que rijan el organismo y sus torneos**, que estén vigentes o que sean aprobadas de tiempo en tiempo por la Junta de Directores de la Liga y que darán fiel cumplimiento a las mismas.*
>
> ***En consecuencia, reconocen que asumir dichos cargos constituirá una renuncia expresa a recurrir a foros no deportivos para dilucidar cualquier controversia que surja por la aplicación de tales disposiciones reglamentarias sin agotar remedios administrativos previamente**. Violentar las disposiciones de este artículo será razón suficiente para la expulsión de la persona que así incumpla de toda función en la Liga.*

(Énfasis suplido).

Como puede observarse, la Regla 3.7 del Reglamento General del BSN aplica a "jugadores" que pertenezcan a cualquier equipo de la Liga Superior Nacional de Baloncesto. Lo cierto es que, según las alegaciones de la "Demanda" y las determinaciones de hecho efectuadas por el foro recurrido, **los apelados están afiliados a los equipos fincas de ciertas franquicias del BSN (Gigantes de Carolina/Osos de Manatí), y han participado en los torneos de categorías menores del Baloncesto Superior Nacional (BSN-D).**[9]

---

[9] Véase, determinaciones de hecho 4 y 5 de la "Sentencia" recurrida, y alegación número 13 de la "Demanda".

**Estas fincas de desarrollo son criaturas reglamentarias del BSN**, **creadas en virtud del Art. 20.1 de su Reglamento General**. **Surge de este artículo que**: (**1**) **el torneo de desarrollo del BSN-D estará compuesto por las franquicias del BSN**, (**2**) **La organización y participación en el torneo no puede delegarse a clubes o equipos no pertenecientes a las franquicias del BSN**, (**3**) **las franquicias trabajarán sus categorías menores con los recursos de su organización superior**, **y** (**4**) **la franquicia que falle en tener equipos fincas estará sujeta a sanciones económicas**.

**Esta estrecha correlación entre las franquicias del BSN y el torneo BSN-D solo nos puede llevar a una conclusión**: **los apelados son jugadores de equipos pertenecientes a la Liga Superior Nacional de Baloncesto**, **en sus categorías menores del BSN-D**. **Siendo estos jugadores de equipos participantes en la "Liga Superior Nacional", están sujetos al cumplimiento de la Regla 3.7 del Reglamento General del BSN**. **Por ende**, **deberán dilucidar su reclamo dentro de los canales deportivos**, **y están impedidos de recurrir a foros judiciales sin antes agotar los remedios administrativos disponibles**.

Aunque los apelados argumentan que no son "jugadores" debido a que no han firmado contrato alguno con una de las franquicias del BSN, lo cierto es que, el Art. 15.1 de la Constitución de la FBPR dispone que "se considerarán jugadores y jugadoras de baloncesto las personas naturales que practiquen esta especialidad deportiva". Esta definición forma parte de los reglamentos de las organizaciones afiliadas a la FBPR, incluyendo al BSN. Esta definición debe predominar sobre aquella dispuesta en el Reglamento de Procedimientos Adjudicativos del BSN. Lo anterior, no tan solo por su supremacía, sino porque deberá

prevalecer en caso de duda o conflicto. Véase, Art. 13.4 de la Constitución de la FBPR.

Finalmente, hacemos hincapié en que la autonomía deportiva está ampliamente reconocida tanto en la Ley Núm. 8-2004, *supra,* así como en la Constitución del COPUR,[10] en la Constitución del FBPR, y en el Reglamento General del BSN. Por ende, no albergamos duda de que, **por virtud de la propia Asamblea Legislativa**, **se reconoció la autonomía del deporte para regirse por sus propios reglamentos y determinaciones**, **de acuerdo con la política del Olimpismo Internacional**.

De hecho, de la propia Ley Núm. 8-2004, *supra*, surge que **el COPUR posee competencia para atender**, **en primera instancia**, **controversias en materia deportiva**. Véase, por ejemplo, los Arts. 24 y 25 de la Ley Núm. 8-2004, 3 LPRA secs. 444t y 444u. Por todo lo antes expuesto, concluimos que, tal y como sostiene el BSN, el foro *a quo* carecía de jurisdicción para atender la presente controversia. Por virtud de la autonomía deportiva, corresponde a los foros deportivos adjudicar, en primera instancia, el caso en sus méritos.

**IV.**

Por los fundamentos que anteceden, los que hacemos formar parte de este dictamen, revocamos la "Sentencia" apelada, emitida por el Tribunal de Primera Instancia, Sala de San Juan, por éste carecer de jurisdicción para atender este asunto.

**Notifíquese inmediatamente.**

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[10] El Art. 103 (H) provee que "[e]l Movimiento Olímpico es de orden universal, permanente y con una organización concertada bajo la autoridad suprema del COI [Comité Olímpico Internacional]. En virtud de ello, el COPUR debe actuar de forma autónoma libre de presiones de toda índole y armonía con la Carta Olímpica".